NO. 07-12-0150-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

SEPTEMBER 25, 2012

_____

IN THE INTEREST OF J.A.S. AND J.D.L.S.

_____

FROM THE 110TH DISTRICT COURT OF FLOYD COUNTY;

NO. 10,192; HONORABLE JACK M. GRAHAM, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellants, Eric and Elizabeth,[1] appeal the trial court's order terminating their parental rights to their children, J.A.S. and J.D.L.S. Both parties assert (1) the evidence was legally and factually insufficient to terminate their parental rights and (2) termination of their rights is not in the best interest of either child. We affirm.

---

[1]To protect the parents' and children's privacy, we refer to Appellants by their first names and other interested parties by their initials. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012). *See also* Tex. R. App. P. 9.8(b). Throughout the remainder of this opinion, provisions of the Texas Family Code will be cited as "section ___" and "§ ___."

## Background

The two children the subject of this proceeding are J.A.S., a male born in August 2009, and J.D.L.S., a male born in July 2010. Eric and Elizabeth are their parents. In August 2010, Eric, Elizabeth, J.A.S., and J.D.L.S. were living with Eric's parents in Floydada, Texas. Eric was seventeen years old. Elizabeth was sixteen years old.

### Investigation/Removal

On August 27, 2010, a referral was made to the Texas Department of Family and Protective Services (the Department) for suspected neglectful supervision of J.A.S. and J.D.L.S.[2] An investigator for Child Protective Services (CPS) was assigned to the cases. After a number of unsuccessful attempts to speak with their parents, the investigator was able to meet with them outdoors but was denied entry to the house where they were living with Eric's parents.

Elizabeth informed the investigator that CPS involvement was unnecessary and she would not allow it. She was not enrolled in school. Her hair was knotted with debris in it and there were bugs visibly crawling in her hair. Both parents denied there was any domestic violence in the home.

J.D.L.S. had thrush in his mouth.[3] Although he had a heart murmur that ultimately required surgery, his parents had not followed up on his medical care since his birth. Neither J.D.L.S. nor J.A.S. had received any recent medical care and neither

---

[2]At the time, J.D.L.S. was less than two months old and J.A.S. was approximately one year old.

[3]"Thrush" is a disease caused by fungus and is marked by white patches in the oral cavity. *See Merriam-Webster's Collegiate Dictionary* 1304 (11th Ed. 2003).

were up to date on their immunizations. J.A.S.'s face was dirty with dried snot and his diaper was saggy and wet.

A few days later, the investigator received a tip that Elizabeth was leaving for Oklahoma to avoid CPS involvement with her children. On August 31, Elizabeth and the children were removed from the home. Elizabeth later confirmed Eric was abusing her in the children's presence. She indicated the domestic violence was ongoing throughout their relationship and had taken place at his parents' house. At various times, Eric pushed, kicked, and slapped her. She indicated she had reported Eric to the police in Clovis, New Mexico, after he assaulted her when she was pregnant. She told the investigator that Eric refused her shampoo, soap and access to bathing because he was concerned she would find someone else and would not allow her to go to school because she could interact with other males. To escape the domestic violence, Elizabeth travelled to Oklahoma and New Mexico but ultimately returned to live with Eric on multiple occasions.[4]

Elizabeth also stated that Eric engaged in drug use and his parents were aware of his use. Further, she indicated that, when he committed domestic violence against her while they were at his parents' house, Eric's parents did nothing. Eric's parents denied there was any domestic violence in their home and asserted Eric did not do drugs. Eric subsequently tested positive on a drug screen.

On September 14, after an adversary proceeding, the trial court appointed the Department temporary managing conservator after finding there was a danger to the

---

[4]The investigator testified that, while there were existing CPS reports in Oklahoma and New Mexico, out-of-state CPS offices were unable to complete their cases because Elizabeth fled with the children.

3

children's physical health and safety, there was an urgent need for protection requiring immediate removal and a substantial risk of continuing danger if the children were returned to their parents. The Department developed Plans of Service for each parent delineating the circumstances under which the children would be returned to them. The Plans were reviewed, signed by the parents, and made a part of the trial court's order.

**Elizabeth's Plan Compliance**

While Elizabeth was in CPS's care, she and her children lived at the Children's Home in Lubbock, Texas, where she received Plan services and was driven to high school. In May 2011, after CPS dropped her off at school, she obtained a ride from a stranger and picked her children up from day care. She and the stranger then went to a department store where she and the children were dropped off. She was later found wandering the store with the children while attempting to contact Eric's parents, or someone else, to pick them up. When CPS located her, she indicated she was tired of being in their care and being told what to do. CPS returned her to the Children's Home for a second chance.

Approximately four months later, in September 2011, Elizabeth assaulted a girl living in their shared cottage at the Children's Home. When the house mother arrived, she found Elizabeth sitting in the bathtub holding a radio and threatening to commit suicide. Lubbock police officers subsequently arrested Elizabeth for assault and she was taken to jail where she was bonded out four days later by Eric's mother.

Although the Children's Home refused to take her back after the assault, CPS offered Elizabeth another home where she could continue her schooling and services

while visiting her children on a regular basis. Days later, Elizabeth turned eighteen and refused CPS's offer. Instead, she indicated she was going to live in Lubbock with her grandmother. Three weeks later, Elizabeth indicated she was living in Oklahoma with her aunt. After leaving the Children's Home, she visited her children approximately five times between the months of December 2011 through January 2012. After that, her visititation declined, with her last visit occurring approximately one year prior to the bench trial held in April 2012. After leaving the Children's Home, she made no attempt to restart any services required by her Plan.

**Eric's Plan Compliance**

Eric's Plan required that he notify his caseworker if he changed his address, obtain a stable home and establish stable routines, complete a Battery Intervention and Prevention Program (BIPP), submit to random drug tests, complete a drug/alcohol assessment and follow recommendations, participate in counseling, contact the local office for the Texas Department of Mental Health Mental Retardation (MHMR) to determine whether he qualified for services, complete a psychological assessment and follow recommendations, complete a parenting training program, and visit his children for two hours a week.

At trial, Eric's caseworker testified that he had not complied with the court's order establishing his Plan. That is, he failed to report for drug testing in January and February 2011, claimed completion of a drug/alcohol assessment but did not obtain a release from the provider, contacted MHMR but failed to complete his assessment, failed to complete his counseling or attend a BIPP group, and was discharged from

5

parenting classes for poor attendance. His contact with his caseworker and his visitations with his children were sporadic. When J.D.L.S. had open heart surgery in December 2011, Eric did not visit him and, after May 2011, stopped visiting his children altogether. His caseworker testified his employment history and living arrangements were unstable with no verification of either being provided by Eric. His caseworker also reported that, during this period, Eric was suspected of domestic abuse of his girlfriend in another Floyd County CPS case where an infant's arm was broken.

**The Children**

After Elizabeth left the Children's Home, her children were placed in a foster home. At the bench trial, a CPS caseworker testified that the children had been in an adoptive placement for two months. The foster parents indicated a desire to adopt the children and the caseworker indicated the children were comfortable, doing well and interacting favorably with the foster parents. She further described the children as thriving with all their needs being met.

**Final Order**

On May 1, 2012, the trial court issued its *Final Order In Suit Affecting the Parent-Child Relationship and Order of Termination*. The trial court found that Elizabeth and Eric had (1) knowingly placed or knowingly allowed the children to remain in conditions and surroundings which endangered their physical or emotional well-being; § 161.001(1)(D), (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; § 161.001(1)(E), (3) constructively abandoned the children; § 161.001(1)(N), and (4)

6

failed to comply with the provisions of the court order specifically establishing the actions necessary for them to obtain their children's return. § 161.001(1)(O). The trial court also determined that it was in the children's best interest to terminate the parent-child relationship between Elizabeth and Eric and their children. § 161.001(2). This appeal followed.

## Discussion

### Involuntary Termination – Standard of Review

The natural right existing between parents and their children is of constitutional dimension. *See Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Consequently, termination proceedings are strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985). Parental rights, however, are not absolute and it is essential that the emotional and physical interests of a child not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In proceedings to terminate the parent-child relationship brought under section 161.001, the petitioner must establish one ground listed under subdivision (1) of the statute and also prove that termination is in the best interest of the child. § 161.001; *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005). Though the evidence may be probative of both issues, both elements must be established and proof of one element does not relieve the petitioner of the burden of proving the other. *See In re C.H.*, 89 S.W.3d at 28; *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Further, due process requires

7

application of the clear and convincing standard of proof in cases involving termination of parental rights. *In re J.F.C.,* 96 S.W.3d 256, 253 (Tex. 2002).

In a legal sufficiency review of the evidence to support an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions and the role of the court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* Thus, we disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *See In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005).

The standard of reviewing factual sufficiency of termination findings is whether the evidence is such that a reasonable fact finder could form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.,* 89 S.W.3d at 25-26. Under that standard, we consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.,* 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

**Section 161.001(1)(D), (E)**

The trial court found that Eric and Elizabeth knowingly placed or knowingly allowed their children to remain in conditions or surroundings which endangered their physical or emotional well-being and also engaged in conduct or knowingly placed the children with persons engaged in conduct which endangered the children's physical and emotional well-being. *See* § 161.001(1)(D), (E).[5] "Endanger" means to expose to loss or injury--to jeopardize. *See In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.—Fort Worth 2003, no pet.). Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment;" *Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 616 (Tex.App.—Houston [1st Dist.] 2009, pet. denied), danger to a child need not be established as an independent proposition but may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *See Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). Moreover, the conduct does not have to occur in the child's presence; *Director of Dallas Cty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex.App.—Dallas 1992, no writ), and may occur before the child's birth and both before and after the child has been removed by the Department. *See In re S.M.L.D.,* 150 S.W.3d 754, 757-58 (Tex.App.—Amarillo 2004, no pet.); *In re D.M.,* 58 S.W.3d 801, 812 (Tex.App.—Fort Worth 2001, no pet.).

Under subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was a source of endangerment

---

[5]Throughout the remainder of this opinion, section 161.001(1)(D) will be referred to as "subsection (D)" and section 161.001(1)(E) will be referred to as "subsection (E)."

to the child's physical or emotional well-being.  *In re D.T.,* 34 S.W.3d 625, 632 (Tex.App.—Fort Worth 2000, pet. denied).  A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.  *See In re S.M.L.,* 171 S.W.3d 472, 477 (Tex.App.—Houston [14th Dist.] 2005, no pet.).  Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D).  *See In re J.T.G.,* 121 S.W.3d at 125 (abuse or violent conduct by a parent or other resident of home may produce an endangering environment).  *See also In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living conditions, but also to a parent's conduct in home).  Subsection (D) permits termination based upon a single act or omission.  *Id.*

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act.  *In re J.T.G.,* 121 S.W.3d at 125.  Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by a parent is required.  *Id.; In re D.T.,* 34 S.W.3d at 634.  Thus, while both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment.  *In re S.M.L.,* 171 S.W.3d at 477.  Subsection (D) concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment, and subsection (E) requires a course of conduct rather than a

10

single act or omission. *Id.* (citing *In re J.T.G.*, 121 S.W.3d at 125). *See In re R.D.,* 955 S.W.2d 364, 367 (Tex.App.—San Antonio 1997, pet. denied).

To determine whether termination is necessary, the fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.—Fort Worth 2009, no pet.). Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *Id.; In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.—San Antonio 1998, pet. denied).

**Elizabeth**

When Elizabeth first met a CPS investigator in Texas, she was uncooperative and had evaded similar investigations in several states. She was sixteen years old, living with Eric's parents, without a stable source of income, and was not attending school. She was unkempt, with bugs visibly crawling in her hair, and her clothes were dirty. Although her two month old, J.D.L.S., had thrush in his mouth and suffered from a heart murmur that required surgery, he had not received any follow-up treatment post-birth. Neither J.D.L.S. nor J.A.S. were receiving any medical treatment or were current on their immunizations. J.A.S.'s face was dirty with dried snot and his diaper was saggy and wet. After the visit, she planned to flee the state.

She later told CPS she had been denied proper hygiene and schooling because Eric wanted to isolate her for fear that she would meet someone else. During their relationship, she had suffered ongoing abuse from Eric in the form of pushing, kicking and slapping. In New Mexico, she reported Eric to the police for an assault on her while

11

she was pregnant. Although she repeatedly moved between states to escape Eric's abuse, she ultimately returned to him with her children multiple times.

After she and her children were placed in CPS's care, she tired of being in the Children's Home where she resided with her children while receiving the services required by her Plan. She tired of being told what to do to care for her children and fled without any plan for her children's care or her own safety. Further, after returning to CPS's care, she subsequently assaulted her housemate and threatened to commit suicide. Days later, she was bailed out of jail, rejected a third opportunity to satisfy her Plan while regularly visiting her children, abandoned her children and fled to Oklahoma. Thereafter, she failed to visit her children or apply for required services for more than a year.

By repeatedly returning to Eric, Elizabeth placed her children in an environment that endangered the children's physical and emotional well-being. *See In re C.J.O.,* 325 S.W.3d 261, 265 (Tex.App.—Eastland 2010, pet. denied) ("Domestic violence may be considered evidence of endangerment.")[6] In addition, by moving state-to-state to avoid Eric's abuse without any plan for providing for the children's basic necessities such as food, shelter, developmental or medical needs, she also endangered the children. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex.App.—Fort Worth 2011, pet. denied) ("Stability and permanence are paramount in the upbringing of children.") This behavior is particularly harmful where the children are of such a tender age as to be unable to fend

---

[6]CPS's investigator testified that, when parents have elevated anger and hostile feelings toward one another, these behaviors can be taken out on the children posing a threat to their physical safety.

or care for themselves and their mother is not skilled in childcare or parenting.[7] Although she showed some progress while living at the Children's Home, when she tired of CPS's caring environment and being told what to do to care for her children, she resorted to her prior behavior of spurning CPS involvement, fleeing the situation, subjecting her children to the care of strangers, and attempting to return to an environment of prior abuse—the home of Eric's parents. Later, she attempted suicide before abandoning her children and isolating herself from them for more than a year. *See Jordan v. Dossey,* 325 S.W.3d 700, 724 (Tex.App.—Houston [1st Dist.] 2010, pet. denied) ("A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being."). Accordingly, we find there is legally sufficient evidence to terminate the parental relationship between Elizabeth and her children.

**Eric**

As the children's father, Eric shares in the circumstances endangering the children already discussed with the important exception that he was also the perpetrator of the domestic violence that endangered the children. That Eric failed to complete his counseling services, failed to attend the required BIPP program, and was suspected by CPS of injuring a girlfriend's infant in another CPS case underscores the likelihood that he will continue his violent behavior in the future. *See Jordan,* 325 S.W.3d at 724 ("Evidence that a person engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.") *See also In re T.L.S.,* 170

---

[7]CPS's investigator also testified that Elizabeth was immature in her parenting by her own admission and needed coaching in order to change diapers and make formula.

13

S.W.3d 164, 166 (Tex.App.—Waco 2005, no pet.); *In re M.G.M.,* 163 S.W.3d 191, 202 (Tex.App.—Beaumont 2005, pet. denied).

Further, Elizabeth testified Eric used drugs while they were living with his parents and during CPS's involvement he tested positive for marijuana use. *In re M.E.-M.N.,* 342 S.W.3d at 263 ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."); *Walker,* 312 S.W.3d at 618 ("Because [drug use] exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."); *Vasquez v. Tex. Dep't of Protective and Regulatory Servs.,* 190 S.W.3d 189, 195-96 (Tex.App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child). Further, he twice refused to be tested during the termination proceedings; *see In re K.C.B.,* 280 S.W.3d 888, 895 (Tex.App.—Amarillo 2009, pet. denied) ("The trial court may infer from a refusal to take a drug test that appellant was using drugs."), and admitted using drugs seven to eight months before the bench trial. *See In re M.E.-M.N.,* 342 S.W.3d at 263 ("A parent's decision to engage in illegal drug use during pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.") Accordingly, we find there is legally sufficient evidence to terminate the parental relationship between Eric and his children.

Based on this record, we find the evidence presented by the Department is more than sufficient to support a firm belief or conviction about the truth of the allegations, even when viewed in a neutral light. We further find the evidence was factually

sufficient to support the trial court's judgment that Elizabeth and Eric knowingly placed or knowingly allowed their children to remain in conditions or surroundings which endangered their physical or emotional well-being and also engaged in conduct or knowingly placed the children with persons engaged in conduct which endangered the children's physical and emotional well-being. *See* § 161.001(1)(D), (E). Inasmuch as only one statutory ground is required to terminate parental rights under section 161.001(1), we will omit a discussion of the Department's allegations under section 161.001(1)(N) and (O). See *M.C. v. Tex. Dep't of Family and Protective Servs.,* 300 S.W.3d 305, 311 (Tex.App.—El Paso 2009, pet. denied); *In re M.E.-M.N.*, 342 S.W.3d at 264.

**Best Interest of the Child**

Notwithstanding the sufficiency of the evidence to support termination under section 161.001(1), we must also find clear and convincing evidence that termination of the parent-child relationship was in the best interest of J.A.S. and J.D.L.S. While there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship*; see In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006) (*per curiam*), the focus is on the best interest of the child--not the best interest of the parent. *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex.App.—Dallas 1995, no writ). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. § 263.307(a) (West 2008).

The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child. *In re C.H.*, 89 S.W.3d at 28. In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. *Id.* at 371-72. These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to parental termination. *Walker,* 312 S.W.3d at 619 (citing *In re C.H.*, 89 S.W.3d at 27).

Elizabeth asserts the evidence pertaining to the best interests of the children was legally and factually insufficient because there was no expert testimony regarding the emotional and physical needs of the children and no testimony that a lesser alternative wouldn't suffice or continuing contact with Elizabeth would endanger the children. Eric asserts the evidence was legally and factually insufficient because he turned his life around four months before trial, i.e., he served jail time for his outstanding warrants, completed a portion of his service plan, rented a house and obtained stable

16

employment. Finding the evidence was legally and factually sufficient to support the trial court's best interest finding, we disagree.

Given the evidence, there is a high likelihood that, if left in Elizabeth's or Eric's care, the children would continue to live in a highly unstable and uncertain environment. On the other hand, following removal, the children have been living in a foster home for the past two months as an adoptive placement. The children are doing well and are comfortable. The children's caseworker described them as "thriving" in their new home with all their needs being met.

In light of all the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Elizabeth's and Eric's parental rights was in the children's best interest. Accordingly, we hold the evidence is both legally and factually sufficient to support the trial court's best interest finding.

## Conclusion

Elizabeth's issues one, two, three, four, nine and ten are overruled, pretermitting her remaining issues, and Eric's single issue is overruled. *See* Tex. R. App. P. 47.1. The trial court's order of termination is affirmed.

Patrick A. Pirtle
Justice